UNITED STATES v. E. I. DU PONT DE NEMOURS & CO. et al.

(Circuit Court D. Delaware.   June 21, 1911.)

No. 280.

1. MONOPOLIES (§ 24*)—ANTI-TRUST ACT—SUIT FOR INJUNCTION.

A member of a combination in restraint of interstate commerce, in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), who has in good faith withdrawn from such combination, is not subject to a suit for injunction under section 4 of the act; nor, if such member is a corporation, is the fact that a minority part of its stock is owned by members of the combination sufficient to sustain such a suit, in the absence of proof that such ownership is employed to aid the combination.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 24.*]

2. MONOPOLIES (§ 24*)—ANTI-TRUST ACT—INJUNCTION.

A minority stockholder in a corporation, who is not an officer and takes no part in the management of its business, is not subject to a suit for injunction under Anti-Trust Act July 2, 1890, c. 647, § 4, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3201), because the corporation may be a party to a contract or combination to restrain or monopolize interstate commerce.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 24.*]

3. MONOPOLIES (§ 20*)—ANTI-TRUST ACT—CONSTRUCTION—"COMBINATION IN RESTRAINT OF TRADE."

The provisions of Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), making unlawful any combination "in restraint of trade or commerce among the several states" or to monopolize any part of such trade or commerce, do not make every combination in restraint of competition in interstate trade unlawful, but there may be a restraint of competition that does not amount to a restraint of trade within the meaning of the act. On the other hand, a combination cannot escape the condemnation of the act merely because of the form it assumes, and a single corporation, if it arbitrarily uses its power to force weaker competitors out of business, or to coerce them into a sale to or union with such corporation, puts a restraint on interstate commerce, and monopolizes or attempts to monopolize a part of such commerce, in a sense that violates the act.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*

For other definitions, see Words and Phrases, vol. 2, pp. 1275, 1276; vol. 8, p. 7606.]

4. MONOPOLIES (§ 20*)—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE.

In 1872 seven of the largest manufacturers of powder and other explosives in the United States organized what was called the "Gunpowder Trade Association," which, at its meetings and through committees, fixed prices which the constituent members were required to observe under penalty of fines. It also apportioned territory between its members, authorized the cutting of prices in particular localities in order to drive competitors out of the market or force them to come into the association, and apportioned the losses, if any, from such price cutting, between the members. Subsequently other companies were taken into the association, until there were 17 members; and it was continued with some changes in the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

fundamental agreement, but none in its purposes or methods, until 1902. At that time E. I. du Pont de Nemours & Co., then the most influential member of the association, passed under a new management, was reorganized into the E. I. du Pont de Nemours Company, and its controlling stockholders and officers inaugurated the policy of acquiring the assets of other corporations and vesting ownership of their plants and the control of their business in their own company. So successfully was this policy carried out, by the use of the methods of the association, that within five years such company had acquired the stock of and caused to be dissolved 64 corporations engaged in the manufacture of powder and other explosives, and controlled from 64 to 100 per cent. of the trade of the United States in the different kinds of explosives sold, and also, directly or through subsidiary corporations, as stockholders, controlled all of the other members of the association which was then dissolved. *Held*, that the formation of such a corporation and its subsidiaries and the adoption of the new policy was merely the continuance in a different form of the illegal association, and that it constituted a combination in restraint of interstate commerce and to monopolize a part of the same, which was unlawful under Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

5. MONOPOLIES (§ 26*)—SUIT TO RESTRAIN UNDER ANTI-TRUST ACT—RELIEF.

Where an existing combination in corporate form has been adjudged unlawful, as in violation of Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), and to have monopolized and to be monopolizing a large part of the interstate trade in a particular commodity, it is the duty of the court, under the power conferred by section 4 of the act to "prevent and restrain" its violation, not only to enjoin further violation of the act, but to render its decree effective by dissolving the illegal combination.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 26.*]

6. MONOPOLIES (§ 24*)—SUIT FOR INJUNCTION UNDER ANTI-TRUST ACT—PARTIES.

To a suit under Anti-Trust Act July 2, 1890, c. 647, § 4, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3201), to restrain violation of the act by corporations alleged to constitute a combination in restraint of or to monopolize interstate commerce, mortgagees of such corporations are not necessary parties, but may be brought in if it appears that their interests will be affected by the decree.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 24.*]

In Equity. Suit by the United States against E. I. du Pont de Nemours & Co. and others. Decree of dismissal as to certain defendants, and for the United States as to all others.

John P. Nields, U. S. Atty., George W. Wickersham, Atty. Gen., William S. Kenyon, Asst. Atty. Gen., and James Scarlet and William A. Glasgow, Jr., Sp. Asst. Attys. Gen., for the United States.

Frederic Ullmann, for defendants American Powder Mills, Miami Powder Co., and Ætna Powder Co.

M. B. & H. H. Johnson, for defendant Austin Powder Co.

Frederick Seymour, for defendant Equitable Powder Mfg. Co.

David T. Marvel and David T. Watson, for defendant Henry A. du Pont.

Burton B. Tuttle, for defendant King Powder Co.

John C. Spooner, James M. Townsend, George S. Graham, William S. Hilles, and William H. Button, for remaining defendants.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

LANNING, Circuit Judge.  This is a suit in equity instituted by the United States under the Sherman anti-trust act against 43 corporate and individual defendants for the purpose of obtaining a decree adjudging the defendants guilty of maintaining a combination or conspiracy in restraint of interstate commerce and of monopolizing or attempting to monopolize such commerce, or a part thereof, and awarding an injunction to prevent and restrain further violations of the act.  Thirty-six answers have been filed by 41 of the defendants. Two of the defendants—Austin Powder Company and Metropolitan Powder Company—have filed no answers.  The petition and answers fill a volume of over 500 pages.  We do not deem it necessary to present a detailed statement of the facts alleged in the pleadings.  The petition is so admirably framed and the answers meet the allegations of the petition so fairly that there is no difficulty in determining the issues of fact or of law.  Then, too, while the proofs fill a dozen volumes, we have had such valuable aid from counsel in their briefs and their oral arguments that we have easily reached the conclusion that there is no serious controversy as to the essential facts.

The case, as we view it, is to be decided upon evidence about which there is practically no dispute.  Our task is by a study of unimpeached documentary and other evidence to ascertain (1) what were the relations of the defendants when this suit was commenced; (2) whether those relations are inimical to the law; and, if so, (3) what the relief shall be.  That task will be simplified if, in the first place, we determine which of the defendants are clearly shown to have had no connection at the time of the commencement of this suit with any combination or conspiracy of the nature described in the petition; for, as the only relief we can grant in this proceeding is injunctive, the petition must be dismissed as to any defendant who was not violating the law, or threatening to violate it, when the suit was commenced. One may be indicted for a former connection with a combination or conspiracy violative of the anti-trust act; but, after he has in good faith withdrawn from such a combination or conspiracy, he is no longer a subject of the injunctive power of a court of equity.

Ætna Powder Company of Indiana, Miami Powder Company of Ohio, and American Powder Mills of Massachusetts have filed a joint and several answer, in which they deny that they were parties to any of the agreements mentioned in the petition when this suit was commenced, and aver that, at the time of the commencement of the suit, none of them had any shares of capital stock or other interest in any of the other defendant companies; that, as between themselves, they were not competitors, since one of them was a manufacturer of gunpowder for sporting purposes only, another of black powder for blasting purposes only, and the remaining one of dynamite and fuses only; and that they have not sold and do not sell any of their commodities at prices fixed or dictated by any of the other defendants.  The proofs amply support the averments of the answer, and establish the fact to be that, although all of these companies did in former years enter with others of the defendants into certain trade agreements to be more

particularly referred to hereafter, they withdrew therefrom in 1906, and that for at least seven months before the commencement of this suit none of them had any connection, direct or indirect with any of the alleged unlawful combinations set forth in the petition.

It is charged that the Equitable Powder Manufacturing Company was incorporated in January, 1892; that E. I. du Pont de Nemours & Co., a partnership then existing in Delaware, acquired 49 per cent. of its capital stock; that the stock is now held by one of the defendants; that shortly after its incorporation the Equitable constructed a powder mill in Illinois, where it has ever since manufactured and sold in interstate trade gunpowder and other high explosives; that ever since its organization competition in the shipment and sale of gunpowder and other explosives between that company and others of the defendants has been suppressed and eliminated; that the prices for its commodities have been fixed by the parties to the alleged combination; that E. I. du Pont de Nemours & Co., the partnership referred to, and its successors, have ever since dominated and controlled the Equitable by virtue of the ownership of 49 per cent. of its capital stock; and that the Equitable has been and now is a party to the alleged combination. The answer of the Equitable admits that the partnership referred to purchased 49 per cent. of its capital stock, but says the purchase was made from certain of its stockholders four years after its incorporation, and denies that it was a party to the purchase; or that competition between it and other parties had been suppressed or eliminated, or that its prices have been fixed by any other parties to this proceeding, or that its business has been dominated or controlled by the partnership referred to or its successors, or that it has been, or is, a party to any combination or conspiracy. It also avers that it has not been a member of any trade association since July 1, 1903, that it is not, and for a long time before the commencement of this proceeding had not been, a stockholder in any other powder company, and that its business has long been carried on in competition with that of the other defendants and other manufacturers and vendors of black gunpowder and black blasting powder. The evidence of Mr. F. W. Olin, the president of the Equitable, who was called as a witness for the government, establishes the truth of the averments of the answer. There is no doubt that the Equitable withdrew from the Gunpowder Trade Association four years before this suit was commenced, and that it now has no connection whatever with any combination of vendors of explosives. It is true that 490 of its 1,000 shares of capital stock are owned by one or more of the defendant companies; but the averment of the government's petition that the business of the Equitable is dominated and controlled by any combination is not shown to be the fact. A business is not necessarily controlled by the mere purchase of a minority interest in it; nor is there any proof that the Equitable has at any time since July 1, 1903, directly or indirectly aided any of the defendants in efforts to control the trade in explosives, or submitted or been subjected to external coercion of any kind. We are not at liberty, by the extraordinary writ of injunction, to interfere with the ownership of the 490 shares of the Equitable, in the

absence of proof that that ownership is employed to aid the combination described in the government's petition.

Previous to 1897 Austin Powder Company, of Cleveland, Ohio, was a party to several contracts alleged by the United States to have been violative of the anti-trust act; but the only fact affecting that company, alleged in the petition or proved, that existed at the commencement of this suit, is the ownership by one of the other defendant corporations of 266 of the 800 shares of its capital stock. There is no proof that the ownership of this minority interest in the capital stock of the Austin has been used for any unlawful purpose. While the Austin has filed no answer, it appears that, by an agreement with counsel for the government, it reserved the right to move to dismiss the petition as to it.

King Powder Company, of Cincinnati, Ohio, Marcellus Powder Company, of Marcellus, N. Y., and Ohio Powder Company, of Youngstown, Ohio, were incorporated in 1878 and 1881. They erected mills in New York and Ohio, and it is charged that members of the Gunpowder Trade Association waged against them such a destructive warfare that between 1883 and 1886 the prices of explosives within their fields of competition were reduced below the cost of manufacture, that the owners of the capital stocks of the Marcellus and the Ohio companies were compelled to sell their stocks to certain members of the Gunpowder Trade Association, that those two companies were subsequently dissolved, and that King Powder Company was forced into an agreement by which its business was controlled by the Gunpowder Trade Association, which association was formed under an agreement dated April 29, 1872, and continued under other agreements dated August 23, 1886, December 19, 1889, and July 1, 1896. King Powder Company was a party to all these agreements, but we need not here consider their effect, since it conclusively appears that on September 5, 1898, it refused longer to adhere to any "schedule on paper," and declared it should thereafter be guided "by the market price set by our competitors." It appears, also, that on January 29, 1901, King Powder Company entered into a contract by which it agreed to sell to E. I. du Pont de Nemours & Co. of 1899 (a corporation of Delaware which succeeded the partnership of the same name) and Laflin & Rand Powder Company the whole of its output, except what should be used by a certain other company, for the period of 25 years; and it is charged that in April, 1901, these two vendees caused King Mercantile Company to be organized, acquired a majority of its capital stock, and used it as an instrumentality for controlling the output of King Powder Company and eliminating the latter company as a competitor. But it is also unnecessary to inquire into the legality of these transactions, for on December 21, 1906, the agreement of January 29, 1901, was formally rescinded by mutual consent of all the interested parties. There is no proof that King Powder Company, after December 21, 1906, was a party to any trade agreement concerning the manufacture or sale of gunpowder or other explosives. On the contrary, the uncontradicted proof is that for seven months before this suit was commenced King Powder Company was

absolutely independent in the conduct of its business, and during that time neither did anything, nor threatened to do anything, in any wise violative of the anti-trust act.

The plant of Anthony Powder Company, Limited, a partnership association of Michigan, was destroyed in 1906 by an explosion. On June 26, 1907, it issued a call for a stockholders' meeting to convene on July 30, 1907, for the purpose of considering the question of dissolving the association and distributing its assets. On the date last mentioned a resolution to dissolve was adopted. The proceedings to dissolve were in progress when this suit was commenced. It was then doing no business, but was proceeding according to law to wind up its affairs.

The American E. C. & Schultze Gunpowder Company, a corporation of Great Britain, had established, prior to November, 1903, at Oakland, N. J., a plant where it was manufacturing and selling smokeless sporting powder. On November 9, 1903, by a written instrument, it leased its plant to E. I. du Pont de Nemours Powder Company of Delaware for 99 years, at an annual rental of £3,750. sterling, with an option of purchase to the lessee. In 1906 the lease was assigned to the E. I. du Pont de Nemours Powder Company of New Jersey (incorporated under the laws of New Jersey in 1903), which company has elected to purchase the plant, and has already paid a part of the purchase money therefor. We find nothing in these facts, so far as the British company is concerned, violative of the anti-trust act.

The Peyton Chemical Company, a corporation of California, does not appear to have been, at the time of the commencement of this suit or at any other time, engaged in manufacturing or selling explosives of any kind, or to have taken any part in fixing the prices of explosives, or had connection with any scheme for controlling any part of the trade in explosives. It does appear that 3,000 of its 6,350 shares of stock are owned by one of the principal defendants, but that alone is insufficient to warrant injunctive relief as against Peyton Chemical Company.

Henry A. du Pont is one of the individual defendants. Previous to 1902 he had frequently represented E. I. du Pont de Nemours & Co. at the meetings of the Gunpowder Trade Association. In 1902 he sold the major part of his interest in that company to other members of the du Pont family, though he acted for a time thereafter as an officer of two of the du Pont corporations. In June, 1906, more than a year before this suit was begun, he resigned all his official positions in the defendant corporations, and since that time has had neither real nor nominal connection with the management of any of the defendant corporations, or with any trade agreement or combination concerning the manufacture or sale of explosives of any kind. His stockholdings in the defendant corporation, after February, 1902, were comparatively small, and as, after June 8, 1906, he was not a director or officer in any of them, and took no part in the management of any of them, he cannot be held individually responsible for the unlawful acts, if any there were, of any corporation of which he was a stockholder. It was impossible for him alone to dominate the busi-

ness of any of the defendant corporations. There is no evidence that he attempted to do so, or that, after June 8, 1906, he had any connection, direct or indirect, with the shaping of policies or the management of the business of any of them. At the time of commencing this suit he was doing nothing, nor was he threatening to do anything, which furnishes the subject-matter of injunctive relief as against him.

Henry F. Baldwin is another individual defendant, who, it is alleged by the United States, was, at the time of the. filing of the petition, a director of one of the du Pont companies and one of the managers of its business. By his answer Baldwin avers that he was a director of the company mentioned for some time previous to June 14, 1907, but that on that day he resigned, and has not since been a director of, or in any way interested in the management or control of, any of the defendant corporations. There is no proof that his answer is incorrect, or that any injunction should be granted as against him.

Before this suit was commenced the capital stocks and properties of other defendant corporations had been acquired by one of the du Pont companies, and they had been dissolved and were no longer in existence. These were the California Powder Works of California, the proceedings to dissolve which were practically completed when this suit was commenced; the Conemaugh Powder Company of Pennsylvania. dissolved April 30, 1906; the Metropolitan Powder Company of California, which has filed no answer and was dissolved September 21, 1905; and the E. I. du Pont Company, incorporated August 1, 1903, under the laws of Delaware, and dissolved July 1, 1907.

For the reasons stated, we think it is clear that the petition should be dismissed as to the following fifteen defendants: Ætna Powder Company, Miami Powder Company, American Powder Mills, Equitable Powder Manufacturing Company, Austin Powder Company, King Powder Company, Anthony Powder Company, Limited, American E. C. & Schultze Gunpowder Company, Peyton Chemical Company, Henry A. du Pont, Henry F. Baldwin, California Powder Works, Conemaugh Powder Company, Metropolitan Powder Company, and E. I. du Pont Company of August 1, 1903.

The remaining defendants are: (1) Hazard Powder Company, a corporation of Connecticut; (2) Laflin & Rand Powder Company, a corporation of New York; (3) Eastern Dynamite Company, a corporation of New Jersey; (4) Fairmont Powder Company, a corporation of West Virginia; (5) International Smokeless Powder & Chemical Company, a corporation of New Jersey; (6) Judson Dynamite & Powder Company. a corporation of California; (7) Delaware Securities Company, incorporated September 20, 1902, under the laws of Delaware; (8) Delaware Investment Company, incorporated September 20, 1902, under the laws of Delaware; (9) California Investment Company, incorporated April 7, 1903, under the laws of Delaware; (10) E. I. du Pont de Nemours & Co. of Pennsylvania, incorporated September 11, 1903, under the laws of Pennsylvania; (11) du Pont International Powder Company, incorporated December 14, 1903, under the laws of Delaware; (12) E. I. du Pont

de Nemours Powder Company, incorporated May 19, 1903, under the laws of New Jersey; (13) E. I. du Pont de Nemours & Co., incorporated February 26, 1902, under the laws of Delaware; (14) Thomas Coleman du Pont; (15) Pierre S. du Pont; (16) Alexis I. du Pont; (17) Alfred I. du Pont; (18) Eugene du Pont; (19) Eugene E. du Pont; (20) Henry F. du Pont; (21) Irenee du Pont; (22) Francis I. du Pont; (23) Victor du Pont, Jr.; (24) Jonathan A. Haskell; (25) Arthur J. Moxham; (26) Hamilton M. Barksdale; (27) Edmond G. Buckner; and (28) Frank L. Connable.

By its petition the United States considered the combination which it alleges the defendants have maintained with reference to six periods, extending from the year 1872 until the commencement of this suit. We shall consider it with reference to two periods, the first extending from 1872 to February, 1902, and the second from February, 1902, to the commencement of this suit, which was July 30, 1907. We make this division for the reason that in February, 1902, as we shall presently see, there was a very important change in the management of the companies in which the du Pont family had been and then was interested. Tracing the history of interstate commerce in gunpowder and other explosives through these two periods, we shall be able to answer the first of the three questions before us, which is:

[1, 2] First. *What were the relations of the 28 defendants last above named when this suit was commenced?*

Much of the first of the two periods antedates July 2, 1890, when the anti-trust act became a law. We are not debarred, however, from considering the methods by which interstate commerce in explosives may have been controlled before the enactment of that law, for it may be that an examination of those methods will disclose facts which will materially aid us in determining the purpose of the trade agreements and the incorporations that followed the enactment of the law and the real relations of the defendants when this suit was commenced. Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. ——, decided May 15, 1911. We shall, therefore, in the first place, sketch as briefly as clarity of statement will permit, the history of the interstate commerce in explosives from 1872 to February, 1902.

On April 29, 1872, at a meeting of manufacturers of gunpowder in New York City, there was organized the "Gunpowder Trade Association." Its members, seven in number, were Hazard Powder Company of Connecticut, Laflin & Rand Powder Company of New York, E. I. du Pont de Nemours & Co. (a partnership then existing in Delaware), Oriental Powder Mills of Maine, Austin Powder Company of Ohio, American Powder Company of Massachusetts, and Miami Powder Company of Ohio. Articles of association were adopted providing that the association should be composed of all manufacturers of gunpowder in the United States who were then or might thereafter be admitted thereto; that of its seven members the Hazard Company, the Laflin & Rand Company, and the du Pont partnership should at all meetings of the association be entitled each to ten votes, the Oriental

to six votes, and each of the other three companies to three votes; that the association should meet quarterly for the purpose of establishing prices, if need be, and hearing and deciding appeals, and determining all questions relative to the trade that might be submitted to it; that a council of five persons should be elected; that the council should meet weekly for the consideration and decision of infractions of agreements and questions of discrepancy and deviations from prices in the different home markets; that appeals from the council should be determined and the minimum prices for powder of the various sorts should be fixed by the association; and that funds necessary for carrying out the provisions of the articles should be assessed in proportion to the votes to which the members, under the terms of the articles, were respectively entitled.

On February 11, 1875, at a regular quarterly meeting of the Gunpowder Trade Association in New York City, representatives of all seven of its members being present, a committee was appointed to consult with the California Powder Works in the matter of its entrance into the markets of the Eastern states. At an adjourned meeting on March 17, 1875, the committee reported that an agreement had been made with the California Powder Works regulating the trade of both of the parties, that it was thought best to preserve the agreement amongst the confidential records of the association, and that, in accordance with the terms of the agreement, the association should adopt a series of rules regulating sales and prices of powder in what was called the "neutral ground," being Utah, Montana, Wyoming, Colorado, and New Mexico. By these rules, which the association immediately adopted, certain agents of the companies constituting the Gunpowder Trade Association fixed the prices of powder delivered in the states and territories composing the "neutral ground," the California Powder Works became bound thereby, and a fine was prescribed for every violation of the rules. On May 3, 1876, the committee of the Gunpowder Trade Association previously appointed to confer with the Sycamore Manufacturing Company reported that that company had promised to observe the rates fixed by the association. On August 2, 1876, the association amended the agreement of April 29, 1872, by authorizing fines to be imposed upon its members for violations of the agreement and prescribing a method of procedure for the trial of alleged offenders before the association and the collection of the fines. On February 11, 1880, the California Powder Works and the seven companies composing the Gunpowder Trade Association entered into a new agreement, in lieu of the one dated February 11, 1875, restricting the right of the members of the association to carry on their trade in certain of the Pacific states and territories, and the right of the California Powder Works to trade in any part of the United States east of the "neutral ground," regulating sales within the neutral territory, and fixing the fines to be paid by those who should violate the terms of the agreement. As illustrations of the power exercised by the association under the agreement of April 29, 1872, out of many that might

be mentioned, we refer to some excerpts from the proofs reproduced in the margin. [1]

Previous to August 23, 1886, the Gunpowder Trade Association composed of the seven members above mentioned, heard and disposed of several hundred complaints of violations of the agreements above referred to and imposed many fines. Other companies, not parties to those agreements, had for some years been waging a warfare with the members of the Gunpowder Trade Association. Among these were the Sycamore Manufacturing Company of Tennessee, the Lake Superior Powder Company of Michigan, the King's Great Western Powder Company (whose name was subsequently changed to the King Powder Company) of Ohio, the Ohio Powder Company of Ohio, and the Marcellus Powder Company of New York. On the date last mentioned (August 23, 1886) these five companies united with the seven companies who had formerly constituted the Gunpowder Trade Association in a new trade agreement the purpose of which, as expressed in its language, was to regulate the business of the parties thereto, including the prices at which powder should be sold, to the end that the parties might avoid unnecessary loss by "ill-regulated or unau-

---

[1] At a special meeting of the Gunpowder Trade Association on October 18, 1876, the following resolutions were adopted:

"Whereas, the reduced prices for blasting powder recently made by certain parties in the coal fields of Ohio, Illinois, and Iowa not only tend to demoralize the general trade but to impair the proper interests of this Association: It is therefore deemed advisable to adopt the following:

"Resolved—That the price of blasting powder in the Youngstown district, which includes the counties of Trumbull and Mahoning, Ohio, and Mercer and Lawrence, Penn., also the Akron and Massilon districts, comprising the coal fields of Summit, Medina, Wayne, Stark, Tuscarawas counties, Ohio, be fixed at $2.50 per keg—car load lots at $2.40 per keg.

"Resolved—That the price of blasting powder in the coal districts of Illinois and Iowa be $2.60 per keg, car load lots $2.50 per keg.

"Resolved—That the foregoing resolutions apply to the consumption in the coal fields only in the states mentioned, that they are passed in self-defense for mutual protection, and to the intent that each associate may be enabled to hold his own trade.

"Resolved—That the Hazard Powder Company be permitted to sell blasting powder as low as $2.00 per keg in the Middlefield district.

"Resolved—That the committee on prices be authorized in their judgment to revise and regulate prices at all points where cuts are made or attempted by any outside parties—notice of such change in prices to be wired to each associate not less than twenty-four hours before the same goes into effect."

At the stated meeting of the association on February 5, 1879, the following was adopted:

"On motion of Col. du Pont, that prices at Memphis, Nashville, and such other points as are affected by the prices of King's powder, be modified as the price committee shall decide."

The compendium of rules of June 1, 1881, contained the following:

"Associates not already in the enjoyment of trade in the Lake Superior district shall refrain from selling powder therein, or to go to that district. Lake Superior Powder Co. to confine its sales of powder to consumers within its proper district."

On August 3, 1881, the association adopted the following:

"On motion, that each associate shall instruct in writing his representative agent at Denver not to sell any powder to agents of the Giant Powder Co. at any price."

thorized" competition. The agreement excepted from its operation trade with foreign countries, with the government of the United States, and with parties within the anthracite regions of the state of Pennsylvania, apportioned amongst its twelve parties the maximum yearly trade allowed to them respectively, provided for a supplementary agreement with the California Powder Works concerning sales in the Pacific states and the "neutral territory," provided for sworn statements of sales to be delivered annually by each of the twelve parties to designated representatives, created a board of arbitration to settle disputes between the parties, provided for the execution of supplementary agreements relating to prices to be maintained for the sales of powder and the general harmonious arrangement of the powder trade, and also provided, finally, that since the Laflin & Rand Powder Company, one of the twelve parties to the agreement, owned a majority of the capital stock of the Schaghticoke Powder Company the former company would guarantee that the latter company would respect and comply with the provisions of the agreement as though it were a party thereto, and that all sales by the Schaghticoke Powder Company should be considered as sales of the Laflin & Rand Powder Company. Supplementary agreements were subsequently entered into with the California Powder Works and by the agents of the parties to the agreement of August 23, 1886, for the regulation of the powder trade in particular localities. New Orleans, Louisville, Cincinnati, and Chattanooga, especially, were affected by such supplementary agreements. It is not improbable that there were other supplementary agreements affecting other places, for it appears that the agreements were furnished in printed blank forms. Their purpose was to regulate the trade by establishing and maintaining uniform prices and giving effect to the principal agreement of August 23, 1886.

The agreement of August 23, 1886, expired by its own terms on December 31, 1889. In anticipation of its expiration the same twelve parties who had executed it, on December 19, 1889, executed a new agreement, called the "Fundamental Agreement," for a term beginning January 1, 1890, and ending June 30, 1895, with an added provision that it should continue thereafter from year to year unless terminated in the manner therein provided for. As this Fundamental Agreement continued to be observed with more or less fidelity by the parties to it, not only before but for several years after the enactment of the anti-trust act, its provisions are of especial interest. Its principal parties were the copartnership, E. I. du Pont de Nemours & Co., and the corporations, Hazard Powder Company and Laflin & Rand Powder Company. These three parties were, in some of the provisions of the agreement, grouped as one collective party and called the "Three Companies." The agreement recited that the twelve parties made and sold gunpowder for blasting or sporting purposes, or both, and declared its purpose to be to regulate in a convenient and desirable manner the business of the parties thereto, to avoid unnecessary loss in the

sale and disposition of their powder by "ill-regulated or unauthorized competition and underbidding of the agents of the parties" thereto, and to protect consumers and the public from unjust fluctuations in prices and from unjust discriminations. It excepted from its operation trade with foreign countries, trade with the government of the United States, and trade in blasting powder in the anthracite regions of Pennsylvania. The portion of the United States subject to the operation of the agreement was divided into seven districts, within each of which, it was declared, uniform prices should generally prevail. Yearly allotments of trade were made to the "Three Companies" as one collective party, and to each of the other nine parties. The trade in the "neutral belt" and in certain of the Pacific states was to be regulated by a supplementary agreement with the California Powder Works. Periods for settlements in the division of trade were fixed, and sworn statements of sales were required to be furnished by each of the parties (the "Three Companies" being considered as one party) to the board of trade, a body established by the agreement, whose duty it was, inter alia, to adjust the differences in sales according to the money values permitted to each party in the division of trade, and to require payment into the treasury of the association by the debtor parties and make distribution thereof amongst all parties according to their rights under the agreement. The board of trade consisted of five members, who were elected by the parties to the agreement at their annual meetings. The board was required to meet quarterly, and was authorized to fix prices, to vary or change the same at any time and for any place, to meet contingencies for the protection of the common interests of the parties to the agreement, to enforce rules and regulations adopted by the parties by any measure it might deem necessary, and to hear and adjudge cases of grievances. General meetings of the parties to the agreement were provided for, and the association at any of its general meetings was authorized to review or reverse the acts of the board of trade and to instruct it upon any matter. It was also provided that any party to the agreement who should suffer excessive loss by an overt act of the board of trade—as by the reduction of a price at a place in treatment of a "local disturbance of trade"—should receive such compensation for the damage sustained by it as might be recommended by the board of trade and agreed to at a general meeting. Supplementary agreements by the parties were authorized relating to the fixing of prices and the control of the trade. It was further agreed that sales by the Schaghticoke Powder Company should be considered as sales of the Laflin & Rand Powder Company and the latter company guaranteed compliance with the provisions of the agreement by the Schaghticoke Company.

In 1895 the copartnership, E. I. du Pont de Nemours & Co., and the Laflin & Rand Powder Company, who then owned a majority of the capital stocks of the Repauno Chemical Company and the Hercules Powder Company, decided to consolidate those two com-

panies and the Atlantic Dynamite Company in one corporation, called the Eastern Dynamite Company, which they caused to be organized under the laws of New Jersey with an authorized capital stock of $2,000,000 (200,000 shares), all of which was issued to the stockholders of the three companies thus brought into subsidiary relations to the Eastern Dynamite Company. By this amalgamation of interests centralization of control of the dynamite business previously carried on by the three companies was secured. Later the Eastern Dynamite Company purchased the stocks of a large number of other powder, dynamite, and chemical companies, and thereby obtained control of them.

Previous to July 1, 1896, the Chattanooga Powder Company, with mills in Tennessee, the Equitable Powder Manufacturing Company, of New Jersey, with a plant in Illinois, the Southern Powder Company, having mills in Georgia, and the Phœnix Powder Manufacturing Company, of West Virginia, with mills in New Jersey, West Virginia, and Illinois, developed competing businesses with one another and with the parties to the Fundamental Agreement of December 19, 1889. Against them, the Hazard, the du Pont, and the Sycamore companies carried on a sharp contest. Negotiations with their representatives, in May, 1896, resulted in allotments of the trade to them, and on August 20, 1896, these four companies, with the California Powder Works and the twelve parties to the Fundamental Agreement of December 19, 1889, being seventeen parties in all, entered into another Fundamental Agreement concerning the manufacture and sale of powder for blasting and sporting purposes, which was dated July 1, 1896, and was in its general terms not unlike the agreement of December 19, 1889. Some time between August 20 and September 24, 1896, however, the board of trade was supplanted by what was thereafter known as the "advisory committee."

On October 26, 1897, an agreement was entered into by ten American manufacturers, eight of whom were parties to the agreement of July 1, 1896, and two European manufacturers, which related to explosives of all kinds, provided that the European parties should not complete works then building in New Jersey, and that the American parties should bear all expenses theretofore incurred in connection therewith, contained mutually restraining provisions as to the erection of factories in the United States and Europe, divided the trade of the world territorially between the American and the European parties, contained provisions for fixing prices, provided a fund for the purpose of protecting the common interest against outside competition, fixed fines and penalties for breaches of the agreement, and contained sundry other provisions for the regulation and control of the trade. This agreement was in existence throughout the period of the war with Spain and until 1906.

On October 21, 1899, the E. I. du Pont de Nemours & Co. was incorporated under the laws of Delaware with an authorized capital stock of $2,000,000. The incorporators of this company were the members of the previous copartnership of the same name—Eugene

du Pont, Francis G. du Pont, Henry A. du Pont, Alexis I. du Pont, Charles I. du Pont, and Alfred I. du Pont. The business and prop-, erty of the copartnership were sold to the corporation, and each partner received a proportion of the capital stock equal to his interest in the copartnership. Eugene du Pont had been the manager of the partnership business for 10 years. He naturally became the president of the corporation. He was also a member of the advisory committee of the associated manufacturers for years prior to January, 1902, in which month he died. Upon Eugene's death the remaining stockholders, excepting Alfred, were strongly disposed to sell out to the Laflin & Rand Powder Company. Alfred solicited the interest of Thomas Coleman du Pont and Pierre S. du Pont, neither of whom had theretofore been interested in the business, and these three persons—Alfred, Thomas, and Pierre du Pont—made to the stockholders an offer to purchase, which was accepted. Thus was it that in February, 1902, the du Pont powder industry passed into the control of those who at present dominate it. For 30 years trade agreements had been in existence, in every one of which the du Ponts were active parties. There were times when the parties to these agreements broke away from and disregarded them, but usually the fines and penalties imposed on the violators preserved the integrity of the organization. The association of manufacturers of powder and other explosives had probably never been stronger than it was in February, 1902, when the change in the management of the du Pont works took place. It had for years arbitrarily fixed prices in the different parts of the United States, waging a disastrous warfare against competitors until they were coerced into terms satisfactory to the association or brought into the association. In express language, the trade agreements disclosed the purpose of fixing prices, and at the meetings of the association, and of its council, board of arbitration, board of trade, and advisory committee, measures were often devised to limit the output of the members of the association and to crush competition by manufacturers not members of the association. When Thomas Coleman du Pont, Pierre S. du Pont, and Alfred I. du Pont purchased the du Pont business, they came into possession of a business that had been developed under trade agreements which the learned counsel for the defendants admit contravene at least the first section of the anti-trust act. One of these agreements—the one dated July 1, 1896—was still in force, and it is important to know how the associated parties conducted their business affairs after the death of Eugene du Pont in January, 1902.

On February 26, 1902, Thomas Coleman, Pierre S., and Alfred I. du Pont caused to be organized, under the laws of Delaware, a new corporation, called E. I. du Pont de Nemours Company with an authorized capital stock of $20,000,000. This new company (hereafter called the du Pont Company of 1902) then issued its promissory notes for the sum of $12,000,000 and 119,970 shares of its capital stock, whose par value was $11,997,000, to E. I. du Pont de Nemours & Co. of 1899 for the property, assets, and good will of the latter company, excepting certain parcels of its real estate, and the stockholders

of the latter company amongst whom the notes and stock of the new company had been distributed in proportion to their holdings of stock in the company of 1899, caused 89,400 shares of the stock of the new company to be transferred to Thomas Coleman, Pierre S., and Alfred I. du Pont. The stock so transferred to these three gentlemen gave them the control of the du Pont Company of 1902, and that control they have ever since had. About 40 per cent. of the property acquired from the corporation of 1899 by the du Pont Company of 1902 consisted of five plants used in manufacturing and selling the du Pont explosives, namely, one at Wilmington, Del., one at Sycamore, Tenn., one at Mooar, Iowa, one at Carney's Point, N. J., and one in the anthracite region of Pennsylvania. About 60 per cent. consisted of stocks in other corporations which manufactured and sold explosives of various kinds. It owned all of the stock of the Hazard Powder Company, consisting of 10,000 shares, which company had but one operating plant; the greater part of its assets consisting of stocks in other companies. The du Pont Company of 1902 was therefore at first both a holding and an operating company. Its interest as a holding company exceeded its interest as an operating company. Indeed, its interest as an operating company continued but little over a year, for by October 1, 1903, it had conveyed all its tangible assets to other corporations for the stocks of those corporations. On April 2, 1902, Thomas Coleman du Pont, president of the du Pont Company of 1902, was elected a member of the advisory committee of the association organized under the trade agreement of July 1, 1896. On October 2, 1902, at the annual general meeting of the manufacturers' association, Mr. T. C. du Pont being in the chair, a revised compendium of rules was recommended to the advisory committee for adoption and on November 7th that committee adopted the compendium. It authorized the advisory committee to appoint a special committee which should have authority, between the meetings of the advisory committee, to increase rebates on existing contracts for blasting powder and to recommend sales below the schedule prices to buyers under contract, and contained other drastic provisions for eliminating competition and controlling the trade. Mr. T. C. du Pont was a member of this special committee. At this time the du Pont Company of 1902 owned stocks in the Austin Powder Company, Birmingham Powder Company, California Powder Works, Chattanooga Powder Company, Consumers Powder Company, Eastern Dynamite Company, Enterprise Powder Company, Equitable Powder Manufacturing Company, Fairmont Powder Company, Indiana Powder Company, Laflin Powder Manufacturing Company, Lake Superior Powder Company, Mahoning Powder Company, Northwestern Powder Company, Ohio Powder Company, Oriental Powder Mills, and Phœnix Powder Manufacturing Company. It owned, as above stated, all the capital stock of the Hazard Powder Company, and that company owned stocks in the Eastern Dynamite Company, Hecla Powder Company, Lake Superior Powder Company, Ohio Powder Company, Oriental Powder Mills, and Phœnix Powder Manufacturing Company. Of these companies the du Pont Company of 1902 controlled only the Fairmont

and the Oriental. Pierre S. du Pont says that he and his associates felt, at the time they took over the property of the du Pont Company of 1899, that they commanded but little of the business of these other corporations. In the course of their investigations they discovered that the Laflin & Rand Powder Company was largely interested by reason of its stockholdings in many of these other corporations, and that the du Pont Company of 1902 and the Laflin & Rand Company, together, could control them. He declares that their plants were pretty thoroughly scattered about the country and were well located, that freights on explosives are very high, so that it is impossible to ship them to any great distance without undue expense, and that the plants were desirable ones to control. The plan was then conceived of purchasing the capital stock of the Laflin & Rand Powder Company, consisting of 10,000 shares, which company, it will be remembered, had been a party to each of the trade agreements of April 29, 1872, August 23, 1886, December 19, 1889, and July 1, 1896, and had participated in the enforcement of the methods of the association of manufacturers for the elimination of competition and the control of the trade. If the du Pont Company of 1902 and the Hazard and the Laflin & Rand companies could be united in corporate form it was as apparent then as it is now that the advantages that had been obtained under the trade agreements could be more firmly and more certainly retained. Accordingly, the following plan for securing control of the Laflin & Rand Company was devised:

On September 20, 1902, under the laws of Delaware, there were organized the Delaware Securities Company, with an authorized capital stock of $8,000,000, and the Delaware Investment Company, with an authorized capital stock of $2,500,000. Of certain persons, who held 5,524 shares, or a majority, of the stock of the Laflin & Rand Company, a part also held 950 shares of the stock of the Moosic Powder Company. That part refused to sell their holdings in the Laflin & Rand Company unless the purchaser would also take the 950 shares of the Moosic stock. Accordingly, T. C. du Pont obtained an option on the majority of the stock of the Laflin & Rand Company and on the 950 shares of the Moosic stock. In payment for the 5,524 shares of the Laflin & Rand stock and for his services T. C. du Pont, who, under his option, had acquired the 5,524 shares of the Laflin & Rand stock, received from the Delaware Securities Company $3,998,000 (par value) of its stock and $2,209,600 of its bonds; that is to say, over $1,100 in such stock and bonds for each share of the stock of the Laflin & Rand Company. Much the larger part of the stock of the Delaware Securities Company, and therefore the control of that company, was transferred to the du Pont Company of 1902. In payment for the 950 shares of the Moosic stock and for his services T. C. du Pont, who, under his option, had acquired that stock also, received from the Delaware Investment Company $2,498,000 (par value) of its stock and $2,500,000 of its bonds, of which stock much the larger part, and therefore the control, was transferred to the du Pont Company of 1902. The bonds of the Delaware Securities Company and the Delaware Investment Company were secured by the Laflin & Rand stock and the Moosic stock so purchased, and by stock of the East-

ern Dynamite Company, the Hazard Powder Company, and the du Pont Company of 1902, loaned for that purpose by T. C. du Pont. By this arrangement it will be observed the Laflin & Rand Company was controlled by the Delaware Securities Company, and the Delaware Securities Company by the du Pont Company of 1902. At the time of this purchase the Laflin & Rand Company owned 1,410 of the 3,000 shares of the Moosic; consequently, the acquisition of the additional 950 shares of the Moosic, whose par value was $95,000, and for which was paid stock and bonds of the par value of $4,998,000, gave to the du Pont Company of 1902 control, also, of the Moosic Powder Company. This was a seemingly excessive price to pay for such control, and is strong evidence of a purpose to destroy competition and promote monopoly; for in less than a year afterward the whole of the capital stock of the Moosic Powder Company ($300,000) was transferred to E. I. du Pont de Nemours & Co. of Pennsylvania for $889,458.95 of the stock of the holding company.

Some time previous to 1902 the Fairmont Powder Company had been organized under the laws of West Virginia. The combination then existing under the trade agreement of July 1, 1896, instituted a contest against the Fairmont. Prices were reduced and in the year 1902 the du Pont Company of 1902 obtained the Fairmont's stock. These transactions were completed in October, 1902; that is, in the same month in which the revised compendium of rules for the government of the associated companies, above referred to, went into effect. Mr. T. C. du Pont, one of the purchasers of the du Pont business in February, 1902, without previous experience in the powder or explosives business, but with an ability that commands high admiration, succeeded, within the period of six months after his election as a member of the advisory committee of the associated companies, in cementing the principal parties to the trade association in a union much more able to cope with competitors and to secure control of the trade in powder and other explosives than any of the associations that had preceded it. The effects of the consolidation were soon evident. In December, 1902, Mr. Arthur J. Moxham, then president of the Hazard Powder Company, delivered an address at a general meeting of the associated companies in which, after reviewing the history of the explosives trade for some years and concluding that the advance in prices from 1896 to 1902 had been too small, he said:

"It does not suffice to say that at to-day's prices there is a fair margin of profit, because the fact is that at to-day's prices there ought to be something more than a fair margin. There should be a heavy margin of profit, and in the fact that there is not we see a menace to the future of the business. The present phenomenal prosperity cannot last. If past history is to guide us, we must assume that it will be followed by a period of reaction. During this period of reaction the price of powder must come down heavily. When the demand comes from our customers to reduce the price when everything else is being reduced, it will be no answer to say that we did not advance it when we could. During periods of depression the purchaser, not the seller, is in control of the market, and the irresistible logic of all past history shows that his control is absolute. In a country of such trade irregularities as that of the United States, it is only by a high profit during periods of prosperity that a fair return to capital can be maintained in face of the minimum that follows the period of trade distress."

His recommendation, therefore, was that prices should be advanced, and they were advanced immediately in nearly the whole of the United States, thus showing the confidence of the associated companies in their ability to control the explosives business in this country.

In 1903 the Consumers' Powder Company, the Enterprise Powder Manufacturing Company, the Moosic Powder Company, and the Oliver Powder Company, all corporations of Pennsylvania, were merged into E. I. du Pont de Nemours & Co. of Pennsylvania, the capital stock of the last-mentioned company having been increased for that purpose from $20,000 to $2,000,000 and a majority of it being now owned by the next-mentioned company. On May 19, 1903, the E. I. du Pont de Nemours Powder Company (hereafter called the du Pont Company of 1903) was organized under the laws of New Jersey, with an authorized capital of $50,000,000 of preferred and common stock. Thereupon the du Pont Company of 1902 assigned all its stockholdings in other companies (about 35 of them) to the du Pont Company of 1903, and took in exchange therefor $30,200,000 (a majority) of the preferred and common stock of the du Pont Company of 1903. In 1903, also, the California Investment Company was organized under the laws of Delaware with an authorized capital stock of $400,000, the majority of which stock is now owned by the du Pont Company of 1903, and through it the du Pont Company of 1903 obtained control of the Judson Dynamite & Powder Company, a corporation of California, with its authorized capital stock of $2,000,-000. In December, 1903, the du Pont International Powder Company was organized, under the laws of Delaware, with an authorized capital stock, preferred and common, of $10,000,000, the majority of which is owned by the du Pont Company of 1903. Through the du Pont International Company the du Pont Company of 1903 acquired control of the International Smokeless Powder & Chemical Company with its issued preferred and common stock of $9,600,000, which acquisition gave it control of all the trade in military smokeless and ordnance smokeless powders except the part of the trade due to certain powders manufactured by the United States government.

The advisory and special committees of the trade association held numerous meetings between September 24, 1896, and June 30, 1904. Eugene du Pont had been one of the members of the advisory committee and had participated in its clearly revealed policy of acquiring control of the explosives trade under the trade association agreement of July 1, 1896—an agreement which, as previously stated, counsel for the defendants have frankly conceded violated the anti-trust act. There was no diminution of effort to perfect such control after Eugene du Pont's death. On the contrary, after Thomas Coleman, Pierre S., and Alfred I. du Pont had come into the management of the du Pont business, and Thomas Coleman du Pont had been elected as the successor of Eugene in the advisory committee, and become a member of the special committee, the advisory and special committees, as above stated, continued their meetings and fixed special prices and special rebates in multitudes of cases and apportioned the trade in explosives amongst the members of the trade association. In a letter

from the secretary of the special committee to the secretary of the advisory committee, dated as late as June 16, 1904, it appears that the former committee recommended special prices for certain contracts entered into by one of the du Pont companies, and by the Hazard, Laflin & Rand, Oriental, Ohio, Birmingham, Miami, Chattanooga, Phoenix, and Indiana Powder companies, with varying allowances for rebates from the prices so fixed. This policy of fixing prices in particular cases, affecting particular localities, was one which the independent manufacturers of explosives could not easily cope with. The evidence shows that in October, 1905, a committee of independent powder and dynamite manufacturers met Mr. Jonathan A. Haskell, president of the Laflin & Rand Powder Company and vice president of the du Pont Company of 1903, and Mr. Charles Patterson, director of sales for the du Pont Company of 1903, for a conference concerning the low prices at that time prevailing. Mr. Koller, one of the members of the committee of the independents, says that at the conference Mr. Haskell declared that in the past the policy of the interests represented by him had been to buy up plants, but that in the future the "survival of the fittest" would determine who should have the trade. Mr. Haskell admits that he informed this committee that the interests represented by him had discontinued the practice of making agreements to fix prices, and he adds in his testimony that the change in policy was made in 1904.

After the incorporation of the du Pont Company of 1903, a sales board was created. This board, composed of a director of sales and assistant directors, coexisted with the advisory and special committees until June 30, 1904, when the committees were superseded by the sales board, which thereafter exercised the power of fixing prices and policies for the corporations that had, by the methods already outlined, been brought together under one corporate management. In July, 1904, there was no further need of advisory or special committees, or of the trade association formed under the agreement of July 1, 1896. All the advantages of the trade association agreement were now much better secured by the series of corporate transmutations that had followed the introduction of T. C. du Pont and Pierre S. du Pont into the explosives business. Between 1902 and the commencement of this suit in July, 1907, many of the corporations whose property and business had been acquired by the above-mentioned methods were dissolved, and thereby the relations of the combined companies were simplified and the assurances of the perpetuity of their power were increased. We have verified the tabulated statement contained in the brief for the government, and we find that in 1907 the du Pont Company of 1902, through its subsidiary corporation, controlled in the United States of the trade in—

| | | |
|---|---|---|
| Black blasting powder | 64 | per cent. |
| Saltpeter blasting powder | 72 | " " |
| Dynamite | 72 | " " |
| Black sporting powder | 73 | " " |
| Smokeless sporting powder | 64 | " " |
| Smokeless military and ordnance powder, exclusive of what the U. S. government itself made | 100 | " " |

188 F.—10

Certain exhibits furnished by the defendants show that previous to September 22, 1907, the du Pont Company of 1903 and the Eastern Dynamite Company had acquired control of 64 different corporations which between April 30, 1904, and September 22, 1907, they caused to be dissolved. The names of these corporations, with the dates when they were respectively dissolved, are stated in the margin.[2] The petition of the government charges that the policy of acquiring the assets of other corporations and then dissolving them was for the purpose of establishing a monopoly in one corporation. The du Pont Company of 1902, the du Pont Company of 1903, Thomas Coleman du Pont and Pierre S. du Pont admit, by their joint and several answer, that their policy was eventually to vest absolute ownership of all the plants, manufactories and tangible property acquired by the methods above mentioned in one corporation, and then to dissolve the subsidiary corporations. They say, further, that as soon as they can legally do so it is their purpose to dissolve the Laflin & Rand Powder Company, the Hazard Powder Company, the Eastern Dynamite Company, the Delaware Securities Company, and the Delaware Investment Company. It is perfectly clear that in 1902 the plan was originated of bringing under one corporate control as many as possible of the corporations engaged in the explosives business. The achievement of the object was the easier because of the

---

[2] The following is a list of corporations, controlled by the du Pont Company of 1903 and the Eastern Dynamite Company, with the dates when they were dissolved. The list is extracted from Government Exhibits 391 and 392, which the defendants prepared:

| | | | |
|---|---|---|---|
| Blue Ridge Powder Co. | Dissolved April | 30, | 1904. |
| U. S. Dynamite Co. | " " | " | " |
| Laflin Powder Mfg. Co. | " May | 2, | " |
| Hudson River Powder Co. | " June | 3, | " |
| Acme Powder Co. | " " | 30, | " |
| Columbia Powder Co. | " " | " | " |
| Dittmar Powder & Chemical Co. | " " | " | " |
| Mt. Wolf Dynamite Co. | " " | " | " |
| Rock Glycerine Co. | " " | " | " |
| Sterling Dynamite Co. | " " | " | " |
| Atlantic Dynamite Co. of N. J. | " " | " | " |
| "      "      " " N. Y. | " " | " | " |
| Hecla Dynamite Co. | " " | " | " |
| Hercules Powder Co. | " " | " | " |
| Repauno Chemical Co. | " " | " | " |
| Repauno Mfg. Co. | " " | " | " |
| Clinton Dynamite Co. | " July | 1, | " |
| A. Kirk & Son Co. | " " | " | " |
| Robina Fuse Co. | " " | " | " |
| Weldy Dynamite Co. | " " | " | " |
| Oliver Dynamite Co. | " " | " | " |
| Monarch Powder Co. | " Aug. | 1, | " |
| Forcite Powder Co. of N. J. | " Jan. | 1, | 1905. |
| "      "      " " N. Y. | " " | " | " |
| New York Powder Co. of N. J. | " " | " | " |
| "      "      " " N. Y. | " " | " | " |
| Electric Powder Co. | " Jan. | 31, | " |
| Joplin Powder Co. | " March | 1, | " |
| Shenandoah Powder Co. | " " | " | " |
| Brooklyn Glyc. Mfg. & Ref. Co. | " April | 30, | " |

conditions created by the existence from July 1, 1896 of the trade association formed under the agreement of that date. Before 1902 the plan was to destroy competition and obtain a monopoly by the enforcement of drastic provisions in trade agreements, and from 1902 to 1907 it was to achieve the same ends by substituting corporate forms and powers for trade agreements. The success of the plan is evident. Pierre S. du Pont, in his testimony given October 21, 1909, said that the du Pont Company of 1903 had then paid dividends amounting to $11,000,000 and had a surplus in its treasury of $12,000,000 or $13,000,000. It is true that many of the corporations brought into the combination were not large. A considerable number of them, possibly, did little, if any, interstate trade. It is not denied, however, that many of them carried on an extensive commerce among the states. Indeed, it conclusively appears that it is a common practice for manufacturers of explosives to ship their products, dangerous and expensive as the business is, from state to state, and for a manufacturer in one part of the country to ship his products to, and sell them in, other parts in competition with manufacturers there. Shipments by the Hazard Powder Company from Connecticut to Georgia and Alabama to compete there with the Chattanooga and other powder companies are examples of interstate trade disclosed by the evidence.

| | | | | |
|---|---|---|---|---|
| Pennsylvania Torpedo Co. | Dissolved | April | 30, | 1905. |
| A. S. Speece Powder Mfg. Co. | " | " | " | " |
| Giant Mfg. Co. | " | June | 30, | " |
| Standard Exp. Co., Limited | " | " | " | " |
| Metropolitan Powder Co. | " | Sept. | 21, | " |
| Climax Powder Mfg. Co. | " | " | 22, | " |
| Explosives Supply Co. | " | " | " | " |
| American Stor. & Deliv. Co. | " | " | " | " |
| Atlantic Mfg. Co. | " | " | " | " |
| Hudson River Wood Pulp Mfg. Co. | " | " | " | " |
| National Torpedo Co. | " | " | " | " |
| Producers Powder Co. | " | " | " | " |
| Chattanooga Powder Co. | " | " | " | " |
| Lake Superior Powder Co. | " | " | " | " |
| Ohio Powder Co. | " | " | " | " |
| American Forcite Powder Mfg. Co. | " | " | 30, | " |
| Hecla Powder Co. | " | " | " | " |
| Anthracite Powder Co. | " | " | " | " |
| Globe Powder Co. | " | " | " | " |
| Marcellus Powder Co. | " | " | " | " |
| H. Julius Smith Elec. Fuse Co. | " | Dec. | 31, | " |
| James Macbeth & Co. | " | " | " | " |
| Phoenix Powder Mfg. Co. | " | " | " | " |
| Conemaugh Powder Co. | " | April | 30, | 1906. |
| Enterprise High Explosive Co. | " | July | 1, | " |
| Schaghticoke Powder Co. | " | Nov. | 1, | " |
| California Vig. Powder Co. | " | " | 28, | " |
| California Powder Works | " | Jan. | 1, | 1907. |
| Western Torpedo Co. | " | " | " | " |
| Oliver Powder Co. | " | March | 25, | " |
| Thompson Torpedo Co. | " | April | 27, | " |
| E. I. du Pont Co. | " | July | 1, | " |
| King Mercantile Co. | " | " | " | " |
| Mahoning Powder Co. | " | Sept. | 22, | " |

Summarizing the facts as to the relations of the 28 defendants, which are the subject of our present inquiry, we find that:

The Hazard Powder Company has issued 10,000 shares, all of which are owned by the du Pont Company of 1903.

The Laflin & Rand Powder Company has issued 10,000 shares, of which at least 5,524 shares are owned by the Delaware Securities Company, and almost the whole of the stock of the latter company is owned by the du Pont Company of 1903.

The Eastern Dynamite Company has issued 20,000 shares, of which the majority is owned by the Hazard, the Laflin & Rand, and the du Pont Company of 1903.

The Fairmont Powder Company has issued 750 shares, of which the majority is owned by the du Pont Company of 1903.

The International Smokeless Powder & Chemical Company has issued preferred and common stock to the amount of $9,600,000, the majority of which, through the du Pont International Powder Company, is controlled by the du Pont Company of 1903.

The Judson Dynamite & Powder Company has issued 20,000 shares which are owned by the California Investment Company. The stock of this latter company is owned by the du Pont Company of 1903.

The Delaware Securities Company, created for the acquisition of stock of the Laflin & Rand Powder Company, has an authorized capital stock of 80,000 shares, of which a majority is owned by the du Pont Company of 1903.

The Delaware Investment Company, created for the acquisition of 950 shares of the Moosic Powder Company, has an authorized capital stock of 25,000 shares, of which the majority is owned by the du Pont Company of 1903.

The California Investment Company, created for the acquisition of the stock of the Judson Dynamite & Powder Company, has an authorized capital stock of 4,000 shares, a majority of which is owned by the du Pont Company of 1903.

E. I. du Pont de Nemours & Co. of Pennsylvania has an authorized capital stock of 20,000 shares, the majority of which was issued for stocks in subsidiary corporations in Pennsylvania, and passed ultimately into the control of the du Pont Company of 1902 and then into the control of the du Pont Company of 1903.

The du Pont International Powder Company has an authorized capital stock of $10,000,000, preferred and common, a majority of which is owned by the du Pont Company of 1903.

The du Pont Company of 1903 is the owner of the capital stocks, or a majority of the capital stocks, of the corporations above mentioned.

The du Pont Company of 1902 is the owner of the capital stock of the du Pont Company of 1903, and therefore controls all twelve of the above-mentioned corporations as its subsidiaries.

The defendants Thomas Coleman du Pont, Pierre S. du Pont, Alexis I. du Pont, Alfred I. du Pont, Eugene du Pont, Eugene E. du Pont, Henry F. du Pont, Irenee du Pont, Francis I. du Pont, Victor du Pont, Jr., Jonathan A. Haskell, Arthur J. Moxham, Hamilton M.

Barksdale, and Frank L. Connable are each directors of the du Pont companies of 1902 and 1903, or of one of them. Thomas Coleman du Pont is also president of both of them. Edmond G. Buckner is an active director of the International Smokeless Powder & Chemical Company.

It is clear that these 28 defendants are associated in a combination for carrying on interstate commerce in powder and other explosives.

[3] We come, therefore, to the consideration of the second question, which is:

Second. *Is the combination which we have found to exist one that is obnoxious to the provisions of the anti-trust act?*

The act declares that every combination, in the form of a trust or otherwise, in restraint of trade or commerce among the several states, is illegal, and that it is a crime for any person to monopolize, or attempt to monopolize, or combine with others to monopolize, any part of such trade or commerce. From early times it has been a rule of the courts not to construe a legislative act in a literal manner, where it is clear that by such construction the legislative purpose will be defeated. A statute which treats of "deans, prebendaries, parsons, vicars, and others having spiritual promotion," if literally construed would apply to bishops; but by the application of the "rule of reason" bishops are excluded from the terms of such an act because, being of a higher order than any of the functionaries specifically mentioned, it is concluded that the legislative purpose does not extend to bishops. "If an act of Parliament gives a man power to try all causes that arise in his manor of Dale, yet if a cause should arise in which he himself is party, the act is construed not to extend to that, because it is unreasonable that any man should determine his own quarrel." 1 Black. Com. 91. In Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, the Supreme Court had before it the construction of the act which declares it to be—

"unlawful for any person, company, partnership or corporation, in any manner whatsoever, to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, foreigner or foreigners, into the United States, its territories, or the District of Columbia, under contract or agreement, parol or special, express or implied, made previous to the importation or migration of such alien or aliens, foreigner or foreigners, to perform labor or service of any kind in the United States, its territories, or the District of Columbia."

The question was whether the act was applicable to a contract between Holy Trinity Church and an alien, by which the alien agreed to remove from England to New York and enter into the service of the church as its rector and pastor. Mr. Justice Brewer, speaking for the court, said:

"It must be conceded that the act of the corporation is within the letter of this section, for the relation of rector to his church is one of service, and implies labor on the one side with compensation on the other. Not only are the general words 'labor' and 'service' both used, but also, as it were to guard against any narrow interpretation and emphasize a breadth of meaning, to them is added 'of any kind,' and, further, as noticed by the Circuit Judge in his opinion, the fifth section, which makes specific exceptions, among them professional actors, artists, lecturers, singers, and domestic servants,

strengthens the idea that every other kind of labor and service was intended to be reached by the first section. While there is great force to this reasoning, we cannot think Congress intended to denounce with penalties a transaction like that in the present case. It is a familiar rule that a thing may be within the letter of the statute, and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."

A number of bills were introduced in the Fiftieth Congress (in August and September, 1888), designed to make unlawful every combination "to prevent competition" and "to prevent full and free competition" in the sales of articles transported from one state to another. None of them was enacted into law. On December 4, 1889, Mr. Sherman introduced into the Senate of the Fifty-First Congress a bill which declared unlawful every combination "to prevent full and free competition" in such sales. After much debate the bill was, on March 27, 1890, referred to the committee on judiciary, and on April 2, 1890, that committee reported it back to the Senate with an amendment striking out all after its enacting clause and substituting therefor the act as we now have it. As enacted, it does not condemn every combination "to prevent competition." What it condemns is every combination in restraint of trade or commerce among the several states, etc. When the bill went from the Senate to the House, the latter body amended it by inserting a provision extending the scope of the act to all agreements entered into for the purpose of "preventing competition" either in the purchase or sale of commodities; but the amendment was disagreed to. While there is a "general acquiescence in the doctrine that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body" (United States v. Freight Association, 166 U. S. 318, 17 Sup. Ct. 540, 41 L. Ed. 1007), that rule "in the nature of things is not violated by resorting to debates as a means of ascertaining the environment at the time of the enactment of a particular law; that is, the history of the period when it was adopted" (Standard Oil Co. v. United States, 221 U. S. 50, 31 Sup. Ct. 512, 55 L. Ed. ——, decided May 15, 1911).

There is a distinction between restraint of competition and restraint of trade. The latter expression had, when the anti-trust act was passed, a definite legal signification. Not every combination in restraint of competition was, in a legal sense, in restraint of trade. Two men in the same town engaged in the same business as competitors may unite in a copartnership, and thereafter, as between themselves, substitute co-operation for competition. Their combination restrains competition, and if their town is located near the line between two states, and each has been trading in both states, their combination restrains competition in interstate trade. But it does not necessarily follow that such restraint of competition is a restraint of interstate

trade and commerce. The determination of whether it be so must depend upon the facts and circumstances of each individual case. It is undoubtedly the policy of the statute that competitive conditions in interstate trade should be maintained wherever their abolition would tend to suppress or diminish such trade. But this being true does not read into the statute a denunciation of all agreements that may restrain competition without regard to their purpose or direct effect to restrain "trade or commerce among the several states." To what extent the anti-trust act condemns combinations that restrain full and free competition in interstate trade is a question that has been much debated. For a dozen years, at least, it has been settled that it does not condemn combinations which only indirectly, remotely, or incidentally restrain interstate trade.

The recent decisions of the Supreme Court in Standard Oil Co. v. United States, and American Tobacco Co. v. United States, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. ——, make it quite clear that the language of the anti-trust act is not to receive that literal construction which will impair rather than enhance freedom of interstate commerce. As we read those decisions, restraint of interstate trade and restraint of competition in interstate trade are not interchangeable expressions. There may be, under the anti-trust act, restraint of competition that does not amount to restraint of interstate trade, just as before the passage of the act there might have been restraint of competition that did not amount to a common-law restraint of trade. This fact was plainly recognized in United States v. Joint Traffic Association, 171 U. S. 505, 567, 19 Sup. Ct. 25, 31, 43 L. Ed. 259, where Mr. Justice Peckham said:

"We might say that the formation of corporations for business or manufacturing purposes has never, to our knowledge, been regarded in the nature of a contract in restraint of trade or commerce. The same may be said of the contract of partnership. It might also be difficult to show that the appointment by two or more producers of the same person to sell their goods on commission was a matter in any degree in restraint of trade. We are not aware that it has ever been claimed that a lease or purchase by a farmer, a manufacturer, or merchant of an additional farm, manufactory, or shop, or the withdrawal from business of any farmer, merchant, or manufacturer, restrained commerce or trade within the legal definition of that term."

While all this is true, the recent decisions of the Supreme Court make it equally clear that a combination cannot escape the condemnation of the anti-trust act merely by the form it assumes or by the dress it wears. It matters not whether the combination be "in the form of a trust or otherwise," whether it be in the form of a trade association or a corporation, if it arbitrarily uses its power to force weaker competitors out of business, or to coerce them into a sale to or union with the combination, it puts a restraint upon interstate commerce, and monopolizes or attempts to monopolize a part of that commerce, in a sense that violates the anti-trust act.

[4] The record of the case now before us shows that from 1872 to 1902, a period of 30 years, the purpose of the trade associations had been to dominate the powder and explosives trade in the United States, by fixing prices, not according to any law of supply and demand, for they arbitrarily limited the output of each member, but according to

the will of their managers. It appears, further, that although these associations were not always strong enough to control absolutely the prices of explosives, their purpose to do so was never abandoned. Under the last of the trade association agreements—the one dated July 1, 1896, and which was in force until June 30, 1904—the control of the combination was firmer than it had before been. Succeeding the death of Eugene du Pont in January, 1902, and the advent of Thomas Coleman du Pont and Pierre S. Du Pont, the attempt was made to continue the restraint upon interstate commerce and the monopoly then existing by vesting, in a few corporations, the title to the assets of all the corporations affiliated with the trade association, then dissolving the corporations whose assets had been so acquired, and binding the few corporations owning the operating plants in one holding company, which should be able to prescribe policies and control the business of all the subsidiaries without the uncertainties attendant upon a combinaiton in the nature of a trade association. That attempt resulted in complete success.

Much the larger part of the trade in black and smokeless powder and dynamite in the United States is now under the control of the combination supported by the 28 defendants above named. That combination is the successor of the combination in existence from 1896 to June 30, 1904. It is a significant fact that the trade association, organized under the agreement of July 1, 1896, was not dissolved until June 30, 1904. It had been utilized until that date by Thomas Coleman du Pont, Pierre S. du Pont, and Alfred I. du Pont in suppressing competition and thereby building up a monopoly. Between February, 1902, and June, 1904, the combination had been so completely transmuted into a corporate form that the trade association was no longer necessary. Consequently the trade association was dissolved, and the process of dissolving the corporations whose capital stocks had been acquired, and concentrating their physical assets in one great corporation, was begun. Before the plan had been fully carried out this suit was commenced. The proofs satisfy us that the present form of the combination is no less obnoxious to the law than was the combination under the trade association agreement, which was dissolved on June 30, 1904. The 28 defendants are associated in a combination which, whether the individual defendants were aware of the fact or not, has violated and still plans to violate both section 1 and section 2 of the anti-trust act. We conclude that it is our plain duty to grant such a decree as will prevent and restrain further violations of the act.

[5] Third. *The third and last question therefore is: What shall be the nature of the decree?*

It must be one of dismissal of the petition as to all of the defendants except the 28 who are found to be interested in and supporters of the unlawful combination.

It is contended by counsel for the defendants that there can be no decree against the 28 defendants, for the reason that the title to the property held by the defendant corporations cannot be impaired by any decree of this court. "The most that the government in any event can claim," say the counsel, "is that prior to the organization of the

present defendant companies there did exist contracts and combinations in restraint of trade, and possibly a monopoly of the explosives industry in the United States, and that such combinations and monopoly were participated in by some of the corporations which were later purchased by the present defendants, and possibly that some of the properties that were owned by the corporations that were purchased by the present defendants had been acquired by such corporations as a result of such combinations and monopoly. * * * Even so, the corporations had title to such properties, and if such combinations and monopolies no longer exist the title to such property must be good in subsequent purchasers thereof." To support this argument Brooks v. Martin, 2 Wall. 71, 17 L. Ed. 732, and other cases, are referred to.

But we have found that the corporations organized after the advent into the explosives business of Thomas Coleman du Pont and Pierre S. du Pont are a part of an existing combination in restraint of interstate trade. The du Pont Company of 1902 co-operated with the advisory and special committees of the trade association from April 2, 1902, to June 30, 1904, in fixing prices, apportioning trade amongst the members of the association, allowing rebates, and forcing competitors to submit to their rule. The du Pont Company of 1903 was created to aid the combination in concentrating its power and fastening its hold on the monopoly which it had sedulously built up, and which brought to its members in the short period of six years the enormous profit of $11,000,000 in dividends and $12,000,000 or $13,000,000 in its surplus account. We do not propose by our decree to deal with titles to property. Our power is defined in the fourth section of the anti-trust act. That section invests us "with jurisdiction to prevent and restrain violations" of the act. The same section provides that the petition may contain a prayer that the violation of law therein alleged "shall be enjoined or otherwise prohibited." It is our purpose, as it is our duty, to exert the power thus conferred on us to the extent necessary to "prevent and restrain" further violations of the act. In other words, the relief we can give in this proceeding is preventive and injunctive only. If our decree, limited to that purpose, shall necessitate a discontinuance of present business methods, it is only because those methods are illegal. The incidental results of a sweeping injunction may be serious to the parties immediately concerned; but, in carrying out the command of the statute, which is as obligatory upon this court as it is upon the parties to this suit, such results should not stay our hand. They should only challenge our care that our decree be no more drastic than the facts of the case and the law demand.

The dissolution of more than 60 corporations since the advent of the new management in 1902, and the consequent impossibility of restoring original conditions in the explosives trade, narrows the field of operation of any decree we may make. It should not make the decree any the less effective, however. In the Standard Oil Case Mr. Chief Justice White said:

"It may be conceded that ordinarily, where it was found that acts had been done in violation of the statute, adequate measure of relief would result from restraining the doing of such acts in the future. Swift v. United States,

196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518. But in a case like this, where the condition which has been brought about in violation of the statute, in and of itself, is not only a continued attempt to monopolize, but also a monopolization, the duty to enforce the statute requires the application of broader and more controlling remedies. As penalties which are not authorized by law may not be inflicted by judicial authority, it follows that to meet the situation with which we are confronted the application of remedies twofold in character becomes essential: (1) To forbid the doing in the future of acts like those which we have found to have been done in the past which would be violative of the statute; (2) the exertion of such measure of relief as will effectually dissolve the combination found to exist in violation of the statute, and thus neutralize the extension and continually operating force which the possession of the power unlawfully obtained has brought and will continue to bring about."

Both of these remedies are as clearly demanded in the present case as they were in the Standard Oil Case. The existing combination in the explosives trade is one in restraint of interstate commerce. Its sales board fixes prices and exercises powers which Mr. Haskell, its chairman, admits are even more extended in their scope than were the powers of the advisory and special committees which the sales board superseded on June 30, 1904, after co-operating with them from July, 1903. It has also attempted to monopolize and is attempting to monopolize, and has monopolized, and is now in the possession of a monopoly of, a large part of the explosives trade in the United States Our decree must therefore be one which will forbid future acts violative of the law and compel a dissolution of the combination existing in violation of the law. To stop the business of the combination immediately, however, might be attended with very disastrous consequences. The defendants, or some of them, for example, furnish military and ordnance powders to the United States government. We understand, also, that they furnish explosives used in the construction of the Panama Canal. Their ability to continue so to do should not be destroyed before the expiration of a reasonable time for adjusting their business to the changed conditions. In the Standard Oil and American Tobacco Cases six months were allowed for making the changes necessitated by the decrees entered therein. What time should be allowed in the case now in hand, and what other details should be embodied in the final decree, we cannot now determine.

The present decree will therefore be interlocutory. It will adjudge that the 28 defendants are maintaining a combination in restraint of interstate commerce in powder and other explosives in violation of section 1 of the anti-trust act, that they have attempted to monopolize and have monopolized a part of such commerce in violation of section 2 of that act, that they shall be enjoined from continuing said combination, and that the combination shall be dissolved. The interlocutory decree will further adjudge that this court, in order to obtain such further information as shall enable it to frame a final decree which shall give effective force to its adjudication, will hear the petitioner and the defendants on the 16th day of October next as to the nature of the injunction which shall be granted herein and as to any plan for dissolving said combination which shall be submitted by the petitioner and the defendants, or any of them, to the end that this court may ascertain and determine upon a plan or method for such dissolution

which will not deprive the defendants of the opportunity to re-create, out of the elements now composing said combination, a new condition which shall be honestly in harmony with and not repugnant to the law. The interlocutory decree will further adjudge that both parties shall have leave to take such additional proofs as they may deem proper to be used at the hearing aforesaid. It is not to be inferred, however, that this court will sanction or supervise any new condition that defendants may re-create, or perform any other act which shall be merely administrative in its nature. Hayburn's Case, 2 Dall. 409, 1 L. Ed. 436; United States v. Ferreira, 13 How. 40, 14 L. Ed. 42; Gordon v. United States, 117 U. S. 702, appendix.

[6] We have not overlooked the motion of the defendants to dismiss the petition for want of necessary parties. It appears that certain of the defendant corporations have outstanding bonds secured by mortgages or trust deeds, held by trust companies who are not defendants. As already stated, this suit is not designed, primarily, to deal with or dispose of property rights. We see no reason for bringing in mortgage or other creditors. If, hereafter, it becomes necessary to safeguard their rights, appropriate action can then be taken.

### Interlocutory Decree.

This cause coming on to be heard before the three Circuit Judges of the Third judicial circuit in the Circuit Court of the United States for the District of Delaware, under the provisions of the expediting act of February 11, 1903, in the presence of George W. Wickersham, Attorney General of the United States, William S. Kenyon, assistant to said Attorney General, and James Scarlet and William A. Glasgow, Jr., special assistants to said Attorney General, and Frederic Ullmann for the defendants the American Powder Mills, the Miami Powder Company, and the Ætna Powder Company, M. B. & H. H. Johnson, for the defendant the Austin Powder Company, Frederick Seymour, for the defendant the Equitable Powder Manufacturing Company, David T. Marvel and David T. Watson, for the defendant Henry A. du Pont, Burton B. Tuttle, for the defendant the King Powder Company, and John C. Spooner, James M. Townsend, George S. Graham, William S. Hilles, and William H. Button, for the remaining defendants, and the court having read the pleadings and proofs and heard the argument of counsel, and duly considered the same: and it appearing to the court that the petitioner, the United States of America, is entitled to the relief hereinafter mentioned:

It is thereupon, on this 21st day of June, A. D. 1911, ordered, adjudged, and decreed, and this court, by virtue of the power and authority duly conferred on it by law, does hereby order, adjudge, and decree as follows, to wit:

1. That the petition be dismissed as to the following defendants, namely: Ætna Powder Company, Miami Powder Company, American Powder Mills, Equitable Powder Manufacturing Company, Austin Powder Company, King Powder Company, Anthony Powder Company, Limited, American E. C. & Schultze Gunpowder

Company, Peyton Chemical Company, Henry A. du Pont, Henry F. Baldwin, California Powder Works, Conemaugh Powder Company, Metropolitan Powder Company, and E. I. du Pont Company of August 1, 1903.

2. That the remaining 28 defendants, namely, Hazard Powder Company, Laflin & Rand Powder Company, Eastern Dynamite Company, Fairmont Powder Company, International Smokeless Powder & Chemical Company, Judson Dynamite & Powder Company, Delaware Securities Company, Delaware Investment Company, California Investment Company, E. I. du Pont de Nemours & Co. of Pennsylvania, du Pont International Powder Company, E. I. du Pont de Nemours Powder Company, E. I. du Pont de Nemours & Co., Thomas Coleman du Pont, Pierre S. du Pont, Alexis I. du Pont, Alfred I. du Pont, Eugene du Pont, Eugene E. du Pont, Henry F. du Pont, Irenee du Pont, Francis I. du Pont, Victor du Pont, Jr., Jonathan A. Haskell, Arthur J. Moxham, Hamilton M. Barksdale, Edmond G. Buckner, and Frank L. Connable, are maintaining a combination in restraint of interstate commerce in powder and other explosives in violation of section 1 of the act entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890, that they have attempted to monopolize and have monopolized a part of such commerce in violation of section 2 of that act, that they shall be enjoined from continuing said combination, and that the combination shall be dissolved.

3. That this court, in order to obtain such further information as shall enable it to frame a final decree which shall give effective force to its adjudication, will hear the petitioner and the defendants on the 16th day of October next as to the nature of the injunction which shall be granted herein and as to any plan for dissolving said combination which shall be submitted by the petitioner and the defendants, or any of them, to the end that this court may ascertain and determine upon a plan or method for such dissolution which will not deprive the defendants of the opportunity to re-create, out of the elements now composing said combination, a new condition which shall be honestly in harmony with and not repugnant to the law.

4. That both parties have leave to take such additional proofs as they may deem proper to be used at the hearing aforesaid.

5. That, until the entry of final decree herein, said 28 defendants hereinabove last named are, and each of them is, and the agents and servants of them are jointly and severally hereby enjoined from doing any acts or act which shall in any wise further extend or enlarge the field of operations or the power of the aforesaid combination.

    [Signed]                 GEO. GRAY,
                                 JOS. BUFFINGTON,
                                 W. M. LANNING,
          Circuit Judges of the Third Judicial Circuit.